# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| EMERALD ENVIRONMENTAL SERVICES, INC., | ) ) ) ) | CASE NO. 5:23-cv-575 |
| PLAINTIFF, | ) ) ) | CHIEF JUDGE SARA LIOI |
| vs. | ) ) ) | MEMORANDUM OPINION |
| 7G ENVIRONMENTAL COMPLIANCE MANAGEMENT, LLC, et al., | ) ) ) ) ) | AND ORDER |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendants, 7G Environmental Compliance Management, LLC ("7G") and Jason A. Wiles ("Wiles"), for summary judgment. (Doc. No. 68.) Plaintiff, Emerald Environmental Services, Inc. ("Emerald"), opposes the motion (Doc. No. 69), and defendants have filed a reply. (Doc. No. 71.) For the reasons that follow, the summary judgment motion is granted, in part, and denied, in part.

## I.    BACKGROUND

Emerald and 7G are environmental compliance businesses that specialize in servicing companies that operate gas and refueling stations. Both companies provide underground storage tank ("UST") inspection services, and Emerald also provides petroleum-impacted water removal and storage. (Doc. No. 54 (Deposition of Jason Wiles), at 72 (282–83);[1] *see* Doc. No. 60

---

[1] All page number references to the record herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system. Given the depositions filed on the docket appear in a four-to-a-page format, for ease of reference, a second number appearing in parentheses reflects the corresponding page number supplied by the court reporter.

(Deposition of Scott Hershberger), at 16–17 (81–82); Doc. No. 57 (Deposition of Andrew Hershberger), at 3–4 (9–10); Doc. No. 58 (Deposition of Brian Grimm), at 6–7 (21–22).) While 7G has a nationwide presence, Emerald's footprint has been traditionally limited to Michigan, Indiana, Ohio, Kentucky, and Virginia west of I-77. (Doc. No. 60, at 16 (81), 18 (89); Doc. No. 54, at 74 (292).) At all times relevant to the present dispute, Scott Hershberger  ("Hershberger") was the co-owner, treasurer, and secretary of Emerald. (Doc. No. 69-2 (Affidavit of Scott Hershberger) ¶ 1.) Wiles was a majority owner of 7G. (Doc. No. 54, at 12 (42), 25 (96).)

### A.  The Parties' Joint Business Ventures and the NDA

In 2019, Emerald and 7G began to explore the possibility of entering into joint business ventures to provide complementary environmental compliance and storage services to national gas stations. To facilitate these discussions, the parties agreed to share confidential information about clients and prospective clients and, on November 22, 2019, they executed a "Confidentiality and Non-Disclosure Agreement" ("NDA"). (Doc. No. 54-2 (NDA).) The NDA set forth the parties' rights and responsibilities regarding the sharing of confidential information. (*Id*. ¶¶ 1–4.) The NDA further provided that it could only be modified in writing (*id*. ¶ 13), and that it would "terminate automatically after one hundred eighty (180) days" from the effective date of the agreement, "unless extended in writing by the Parties." (*Id*. ¶ 5.)

The NDA was clear that each company remained free to pass on any particular business opportunity. Specifically, the NDA provided:

**19. <u>NO OBLIGATION</u>. NO PARTY HAS AN OBLIGATION TO DISCLOSE CONFIDENTIAL INFORMATION UNDER THIS AGREEMENT. THIS AGREEMENT IS NOT INTENDED TO, AND DOES NOT, (A) CONSTITUTE AN AGREEMENT OF EITHER PARTY TO PERFORM DUE DILIGENCE, NEGOTIATE, OR CONSUMMATE A TRANSACTION OR TO ENTER INTO ANY BINDING AGREEMENT OR COMMITMENT WITH RESPECT TO A TRANSACTION, OR (B) CONTAIN ALL**

2

**MATTERS UPON WHICH AGREEMENT WOULD HAVE TO BE REACHED WITH RESPECT TO A TRANSACTION IN ORDER TO MAKE A BINDING AGREEMENT OR COMMITMENT. A BINDING AGREEMENT OR COMMITMENT WITH RESPECT TO A TRANSACTION, WILL RESULT IF AND ONLY IF THE PARTIES EXECUTE A DEFINITIVE WRITTEN AGREEMENT, AND EACH OF THE PARTIES MAY DECLINE TO EXECUTE SUCH AN AGREEMENT FOR ANY OR NO REASION, IN EACH PARTY'S SOLE AND ABSOLUTE DISCRETION.**

(*Id*. ¶ 19 (capitalization, underlining, and bolding in original).) The NDA also contained integration and modification clauses that provided:

**12. <u>Integration</u>**. No prior or contemporaneous written or oral agreement(s) between the Parties with respect to the subject matter hereof shall be binding upon either Party. This Agreement constitutes the sole and entire understanding and agreement between the Parties with respect to the subject matter hereof.

**13. <u>Modification</u>**. This Agreement may be modified only in a writing signed by both Parties.

(*Id*. ¶¶ 12–13 (bolding and underlining in original).)

Shortly before or immediately after the expiration of the NDA (the parties have not identified the exact date in the record), Emerald was awarded the monthly and annual UST inspection services work for Client A.[2] (Doc. No. 60, at 12 (63), 18 (86, 89).) Emerald served as the prime contractor for Client A, collecting payment for all work performed but only performing services within Emerald's existing geographical footprint. Emerald subcontracted to 7G the rest of the nationwide inspection services for Client A and paid 7G for its subcontracting work. (*See id*. at 21 (99–100), 34–35 (153–54), 58 (246–47).) Despite the parties' initial success servicing Client A, no written agreement was ever signed with this client. (*Id*. at 35 (155).)

---

[2] Throughout the summary judgment briefing, the parties referred to their clients and prospective clients with letter designations to protect their identities. At the Court's direction, the parties filed under seal a key with the identities of each referenced client and prospective client. (Doc. No. 67 (Key).) For purposes of this Opinion, the Court adopts the parties' approach and will use the same letter designations for these entities.

**B.  The Parties Execute the MOU**

On June 12, 2020—21 days after the NDA expired—the parties executed a document styled "Binding Memorandum of Understanding" ("MOU"). (Doc. No. 54-1 (MOU).) Under this agreement, the parties intended to "jointly market and supply certain environmental goods and services . . . to identified Customers[,]" while working toward entering into long-term agreements ("LTA(s)") to service those customers. (*Id*. ¶ 1.) The stated purpose of the MOU was "to provide the framework" for the parties' LTA negotiations, and it was understood that 7G would "provide[] UST inspection Services and utilize[] a proprietary Software Platform called Protean," while Emerald would provide "UST and storm water inspections, and waste management and disposal" services. (*Id*.)

Protean is a software platform that is used by certain UST inspectors to capture relevant data from the inspections and make it available to the site owner. (Doc. No. 57, at 10–11 (37–41).) Protean is owned by Protean Ventures, LLC, which shares owners with, but is separate from, 7G. Wiles is one of the shared owners. (*See id*. at 12 (42), 72 (285).) By virtue of this relationship, 7G holds a unique license agreement with Protean whereby it can re-license Protean software to 7G customers for a $4.00/per site monthly fee. (*Id*. at 27–29 (102, 105–10),  72–73 (283–86), 82 (325).)

The MOU specifically referenced the NDA and stated that the "NDA is hereby fully incorporated herein." (Doc. No. 54-1 ¶ 2(c).) "In addition to the protections in the NDA, the existence and all terms of this MOU and the NDA" were to be kept confidential. (*Id*. ¶ 2(d).) The MOU provided that, "[d]uring the term of the MOU, and for 2 years thereafter, absent prewritten approval from the other Party," each party covenanted not to contract with or provide any goods or services to each other's "Customers . . . that were provided Goods and Services hereunder or

4

disclosed under the NDA." (*Id*.)

Attached to the MOU was an exhibit that listed Client A as a "Customer" and listed a number of other entities as "Prospective MOU customers[.]" (*Id*. at 3 (MOU Exhibit A).) The exhibit listed pricing information for Client A, and, for the prospective clients, it identified the party who was "leading the opportunity[.]" (*Id*.) With respect to the prospective clients, the exhibit further provided that "[i]f and when the Parties determine such prospects to be viable, they will in good faith determine pricing and terms consistent with the MOU, NDA and the to be negotiated LTA." (*Id*.) Client B was not included in the exhibit.

According to the MOU, it was intended that "the Parties [would] negotiate and execute a five (5) year Long Term Agreement/Joint Venture Agreement ('LTA'), commencing in 2020." (*Id*. ¶ 1.) Toward that end, the MOU provided that "the Parties will continue in good faith to negotiate the terms of the final LTA and terms and conditions of supply, which they shall use their respective commercially reasonable efforts to enter into by August 12, 2020." (*Id*. at 1.) Nonetheless, the MOU also provided that "[i]f the LTA is not agreed and finalized as provided for herein, the Parties will continue to operate under the terms of this MOU, until the LTA is completed." (*Id*. ¶ 1.) There is no dispute that Emerald and 7G did not enter into any LTAs prior to August 12, 2020.

## C.  The Parties Pursue Client B

In September 2021, Emerald and Client B—a Fortune 500 company with more than 2,500 sites across the country—engaged in discussions geared toward Emerald providing Client B with waste removal services, "including absorbent and drum rollout work (collectively 'Drum Work') for various sites maintained by Client B." (Doc. No. 69-2 ¶¶ 2–3.) During this same time period, Client B inquired as to Emerald's ability to bid upon UST inspection services in addition to the

5

Drum Work. (*Id.* ¶ 5; *see* Doc. No. 69-2, Exhibit 2-A (Sept. 2021 Email Exchange between Emerald and Client B); Doc. No. 54-8 (Oct. 2021 Email Exchange between Emerald and Client B).) In response, Emerald requested that it be given an opportunity to submit a proposal with 7G for the inspection services. (Doc. No. 69 ¶ 6.) Given the prospect of Emerald and 7G jointly landing this national account, Hershberger "conducted an introduction of 7G and Wiles to Client B." (*Id.* ¶ 9.)

Emerald and 7G participated in negotiations designed to generate a joint proposal for Client B's inspection needs. Included in these negotiations were discussions regarding how the services to be offered to Client B would be divided between Emerald and 7G. Hershberger anticipated that Emerald would serve as the general contractor for Client B and 7G would subcontract inspection services from Emerald, consistent with the parties' past dealings with Client A. (Doc. No. 60, at 21 (99–100), 39–42 (173–83); *see* Doc. No. 54, at 38–39 (149–51).) According to Emerald, Wiles eventually advised Emerald that it needed to be the prime contractor for Client B in order to obtain the necessary financing for the project. (Doc. No. 60, at 42 (182–84); *see* Doc. No. 54, at 39 (150–51).) Emerald believes this move was the first step in defendants' plan to freeze Emerald out of business opportunities with Client B. (Doc. No. 69, at 17.) In contrast, defendants insist that "Emerald had trouble timely and accurately completing its inspections and it had issues paying 7G on time."(Doc. No. 68, at 11 (citing Doc. No. 54, at 41–42 (158–63), 44–48 (172–89); Doc. No.

60, at 42 (182–84); Doc. No. 61, at 4–7 (14–27), 15–24 (57–93))[3].)[4] Based on these alleged missteps by Emerald, defendants claimed that they feared 7G would be harmed if Emerald could not fully perform in a timely fashion. (*Id.*) In any event, it is undisputed that 7G eventually took the lead in pursuing the prospective joint business opportunity with Client B. On May 2, 2022, a representative of Client B emailed Emerald (via Hershberger) requesting a work proposal concerning the inspection services. (Doc. No. 69-2 ¶ 8.)

On May 9, 2022, Wiles submitted to Client B a Response to Request for Proposal. (Doc. No. 54-4 (Proposal), at 8–14.) In the Introduction Letter to the proposal, Wiles thanked Client B "for providing 7G with the opportunity to respond with Emerald Environmental to your request for services at [Client B] facilities." (*Id.* at 9.) Under the heading "General Terms and Limitations[,]" the proposal provided, in part, that "7G will perform the facility inspections/assessments and provide the scheduled dates. Emerald Environmental will subcontract inspections from 7G." (*Id.* at 12.) Wiles sent an email to Hershberger the same day (May 9, 2022), attaching a copy of the proposal and a worksheet showing a 10% rate for commissions. (*Id.* at 1 (email); *id.* at 2–7 (worksheet).) In the email, Wiles identified "things to still work out: 1) Revised MOU[;] 2) Geographic boundaries for inspections[; and] 3) Duration of Finders/Commission." (*Id.* at 1.) Because Client B had some concerns regarding the proposal, 7G submitted several

---

[3] The record cites provided by defendants do not fully support the representation in their motion that Emerald was having trouble accurately completing its inspections and paying 7G on time. Rather, the record cites establish only that Wiles was concerned about *7G's* ability to perform the contract with Client B and was further concerned that partnering with Emerald to service Client B could result in 7G building up or developing a competitor. Additionally, while Hershberger admitted that Wiles had expressed concerns regarding whether Emerald would be able to "cash flow the work[,]" Hershberger denied that any such concern was valid. (*See* Doc. No. 60, at 42 (182–83).) The supplied record cites contain facts that are far from the undisputed facts defendants claim support their motion.

[4] Defendants claim Wiles shared these concerns with Emerald and Hershberger in "March and April of 2022" but the record citations they identify suggest these conversations occurred in May 2022. (Doc. No. 68, at 13 (citing Doc. No. 60-8 (June 9, 2022 emails); Doc. No. 54, at  41–42 (158–63), 44–48 (172–89)).)

revised proposals to Client B over an unspecified period of time.

### D. The Parties' Business Relationship Deteriorates

As the parties continued to pursue Client B, the relationship between Emerald and 7G became strained. The conflict came to a head on June 9, 2022, as evidenced by a series of emails exchanged between Hershberger and Wiles. On the morning of June 9, 2022, Hershberger sent Wiles an email, attached to which was a draft addendum to the MOU. (Doc. No. 60-8, at 2–3 (6/9/2022, 11:32 a.m. Email); *id*. at 4–5 (Addendum).) The email explained that the addendum was to "address" Client B, and the addendum itself purported to contain Emerald's understanding of the parties' agreement with respect to Client B; namely, that Emerald would receive a 10% commission and perform subcontracted inspections for Client B. (*See id*. at 4.)

That evening (June 9, 2022), Wiles sent a lengthy email to Hershberger and Brian Grimm, a 7G employee, in which he described Hershberger's earlier email as an "ambush executed last minute to exert additional pressure to agree to something against my best interest and contrary to what we intended with [Client B]." (*Id*. at 1–2 (6/9/2022, 6:37 p.m. Email).) Wiles referenced "tough and candid conversations" the parties had during the "May 5–7[, 2022] weekend where [Wiles] clearly stated that [he] could not go forward with [Client B] unless: [Client B] would be a 7G customer with its own vendor number and [Wiles] would pay a commission to Emerald." (*Id*. at 2.) He described the proposed addendum as an "inaccurate and self-serving interpretation of an expired arrangement." (*Id*. at 1.) On that note, Wiles emphasized:

> **The MOU expired on August 12, 2020**. We signed the MOU on 6/12/2020 with the intention to meet and sign a JV [i.e., Joint Venture] which I had my attorney prepare based on a similar arrangement with another partner. This draft JV was emailed to you, and your attorney (cc'd) made redline comments on 4/6/2020. We agreed to finalize the JV/LTA in 60 days which is reflected in the final paragraph of the MOU. The MOU would control [Client A] and any contracts secured by the Prospective MOU customers from MOU Exhibit A in that 60 day period. We did

8

> not finalize the JV/LTA in that 60 day period and the MOU expired on 8/12/2020. The MOU was never intended to be a long-standing agreement and was intended to be a short term formal placeholder to secure [Client A] and the Prospective MOU customers if we landed them in the 60 day period. We have since agreed to work on a deal by deal basis and long abandoned the JV/LTA document my attorney prepared.

(*Id*. at 2 (bolding in original).) Wiles promised that he would "follow through with what we have agreed to and what is reasonable, so long as you acknowledge and accept it in writing with your attorney cc'd before the meeting tomorrow."  (*Id*.) In particular, he indicated that he agreed as follows:

> 1) Client B is a 7G client with its own vendor number. 2) 7G is not going to do "most" of the Client B inspections. 7G is going to do all of the inspections except for an agreed number of sites that Emerald will inspect out of its Kent office *within its existing inspection Client H footprint* as of the weekend of May 5 to "help keep the guys busy." 3) We can agree on the winding down of the commission over the first contract period. I think 10%, 5 %, 2.5% is more than reasonable. That's a ~$500,000 introduction. Not bad for a few meetings and sitting through my demos of proteän and answering their questions. Not to mention the profit from the amount of liquid you are going to remove from water that 7G transfers and proteän dispatches seamlessly to you.

(*Id*. (emphasis in original).) Under the sub-heading "Going forward [as to clients other than Client B]:" Wiles indicated that Emerald could "have 5% off the top of any 7G inspection (not service, protean, parts, etc.) if you bring an existing customer and 2% if we mutually market an entity like Client B where you have no relationship. 1 year. No inspection split. No proteän licenses for Emerald-only inspections [for] Client O). No markup on proteän." (*Id*.) The email ended by Wiles lamenting that "[w]e had such a good thing getting going." (*Id*.)

Hershberger responded to Wiles' email within hours. In his response, Hershberger attempted to assure Wiles that his earlier email was "in no way[,] shape and form [meant] to be a tactical ambush. You and I have worked way too hard to close a deal of this magnitude. This is a great opportunity for us both and we are excited to move forward." (Doc. No. 60-8 (6/9/2022, 9:12

p.m. Email), at 1.) Hershberger indicated that the proposed addendum was "only intended to initiate discussions about specifics we both know needed to be ironed out." (*Id*.) While Hershberger emphasized that the parties had "agreed all along that Emerald would get a 10% commission on the current fee structure excluding parts as an acknowledgement there wasn't room for a commission there." (*Id*.) "As far as a sunset on commission for future contract periods," Hershberger conceded that was "a discussion that can and needs to happen." (*Id*.) Hershberger further explained that "Emerald is going to perform inspections at Client B sites in OH, IN and MI as discussed and will be paid according to the fee structure discussed. There is no intent or desire to expand the footprint, just make any existing operations more efficient." (*Id*.)

As for the MOU, Hershberger stated that "[t]he NDA and MOU are still in force (as I informed you in an email on May 9[)], but we are open to discussing modifications that more accurately reflect how this arrangement we have had that has proven successful can move forward to make a profound impact in the industry. However, we have a binding agreement." (*Id*.) He expressed his belief that "[c]ooler heads need to prevail[,]" and suggested he was willing to discuss the "open items" before the anticipated telephonic conference with Client B the following day. (*Id*.)

It is unclear from the record whether the phone call between Client B, Emerald, and 7G took place on June 10, 2024, as scheduled. What is certain, however, is that on June 20, 2022, 7G entered into a three-year Master Agreement for Contractor Services ("MSA") with Client B. (Doc. No. 69-6 (MSA).) Emerald was not a signatory to this agreement.[5] The MSA contained a clause prohibiting either party from assigning any rights or responsibilities under the agreement without

---

[5] Emerald and Client B did enter into a separate agreement for waste water removal services and Drum Work.

the written consent of the other party. (*Id*. ¶ 16.) Notwithstanding that prohibition, the MSA stated

that "the parties understand that [7G] will subcontract many or all of the Services for each location.

No such subcontract shall relieve [7G] for its obligations under this Agreement." (*Id*.) An exhibit

to the MSA stated, without elaboration, that "Emerald Environmental will subcontract inspections

from 7G." (*Id*., Exhibit A, at 11.) The MSA also provided that any alterations or variations of the

terms must be in writing. (*Id*. ¶ 20.) Notwithstanding these prohibitions, defendants maintain that

Client B and 7G modified and/or abandoned the MSA "[a]lmost immediately" after it was signed

because Client B did not like the complex fee structure contained therein. (Doc. No. 54, at 51

(200–01).) According to defendants, Client B and 7G now proceed under a month-to-month oral

contract with a flat fee and no consideration for whether Emerald conducts *any* inspections. (Doc.

No. 68, at 13 (citing Doc. No. 54, at 51–52 (199–201).)

In addition to effectively cutting Emerald out of any business opportunity regarding

inspections with Client B, Emerald maintains that defendants took steps to damage Emerald's

relationship with other customers. (Doc. No. 69, at 21.) In particular, Emerald asserts that shortly

after negotiations broke down over Client B, "Wiles ordered the restriction of Emerald's access to

the Protean software." (Doc. No. 69-2 ¶ 16.) Once it no longer had access to Protean, Emerald

claims that it was "unable to properly service Client A, causing Client A to transition the service"

at several sites to defendants. (*Id*. ¶  17.)[6]

On February 21, 2023, Emerald brought suit in state court against defendants. (Doc. No.

---

[6] According to defendants, it was Emerald who refused to pay 7G for the inspection work it performed for Client A
as Emerald's subcontractor in an effort to extort the non-bargained-for 10% commission for Client B, and failed to
pay for Client A's access to Protean, which led to Protean, LLC, not 7G, restricting Emerald's access. (Doc. No. 68,
at 22 (record citations omitted).) Hershberger admitted that Emerald did withhold payments to 7G for its
subcontracting work on Client A because 7G did not pay Emerald the commissions it was purportedly owed for Client
B. (*See* Doc. No. 60, at 25 (117), 42 (184).)

1-1 (Complaint).) Emerald's complaint raises eight causes of action: fraud (Count One); breach of implied contract (Count Two); breach of express contract (Count Three); promissory estoppel (Count Four); unjust enrichment/quantum meruit (Count Five); tortious interference with business relations (Count Six); breach of fiduciary duty (Count Seven); and punitive damages (Count Eight). (*Id*.) The tort and quasi-contract claims revolve around Emerald's allegations that Emerald and 7G had an implied agreement, born out of the parties' course of dealings, that 7G would assign its inspection services for Client B to Emerald and pay Emerald a 10% commission. In its breach of express contract claim (Count Three), Emerald seeks to recover as a third-party beneficiary to the MSA between 7G and Client B. On March 20, 2023, defendants removed the action to federal court on the basis of diversity jurisdiction. (Doc. No. 1 (Notice of Removal) ¶¶ 4–5.)

On May 14, 2024, defendants moved for summary dismissal of all claims raised in the complaint. (Doc. No. 68.) The motion largely hinges on defendants' belief that their actions were permitted under the terms of the MOU, which incorporated the terms of the NDA, and which they insist were in full force and effect at all times relevant to the complaint. (*Id*. at 16–29.) Defendants also argue that the undisputed facts demonstrate that they did not commit fraud or tortiously interfere with any of Emerald's business relationships, and that the parties did not arrive at a meeting of the minds as to an agreement to pay Emerald a 10% commission for Client B. (*Id*. at 19–25.)

## II.     STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, a court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). In most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l*

13

*Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a "mere scintilla of evidence is insufficient[.]" *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Under this standard, "the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment [motion]." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks and emphasis omitted) (citing *Anderson*, 477 U.S. at 247–48).

## III.  DISCUSSION

### A.  Effect of the MOU on Emerald's Claims

As previously noted, it is defendants' position that their actions were permitted by the MOU, which defendants posit was in effect until at least June 9, 2022.[7] (Doc. No. 68, at 15–17; *see* Doc. No. 71, at 2.) Emerald, relying on Wiles' representations in his June 9, 2022 email, argues that the agreement had expired and the parties were governed by their course of dealings and performance.[8] (Doc. No. 69, at 29–30.) As such, whether the MOU governs the parties' dispute matters greatly to the Court's resolution of the present dispositive motion. If the MOU was in effect *and* encompassed the business opportunity with Client B, then the majority of Emerald's claims are either barred by the terms of the MOU or prohibited under existing Ohio case law

---

[7] Emerald alternatively argues that Wiles repudiated the MOU in his June 9, 2022 email when he expressed his belief that the MOU had expired. (Doc. No. 69, at 30.) Without conceding the point, defendants suggest that, even if there was an anticipatory repudiation of the MOU by Wiles on June 9, 2022, the MOU remained in effect until that date, and all conduct occurring prior to that date was governed by the terms of the MOU. (Doc. No. 71, at 3 (erroneous reference to June 9, 2024).)

[8] Interestingly, the parties have now each taken a position that is diametrically opposed to the position their respective executive officers took in the June 9, 2022 email exchange. For their part, defendants maintain that Wiles was simply "wrong [when he stated that the MOU had expired]—a fact immediately addressed by Emerald." (Doc. No. 71, at 16 (citing Doc. No. 60-8, at 2).)

14

governing torts and contracts. For this reason, the Court begins with an examination of the MOU.

### 1. Law on Contract Interpretation

Under Ohio law,[9] "the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing cases applying Ohio law). "When confronted with an issue of contract interpretation, [a court's] role is to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). To that end, courts should "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Id.* In addition, courts should "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Id.*; *see also Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) (holding that "common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some

---

[9] As a court sitting in diversity, it is bound to follow the substantive law, including the choice-of-law rules, of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg., Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 2d 1477 (1941); *see Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing, among authorities, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)). Both the NDA and the MOU provide that they are to be interpreted under New York law. (Doc. No. 54-1, at 1 ("This MOU shall be governed by the laws of New York[.]"); Doc. No. 54-2 ¶ 16 (NDA Choice of Law Provision).) Ordinarily the Court would employ Ohio's choice-of-law rules to determine whether to enforce the parties' contractual forum selection clauses. Two reasons make such an analysis unnecessary. First, under Ohio law, a choice-of-law analysis is only necessary when there is a conflict between the law of the forum and the law of the selected state. *McCruter v. Travelers Home & Marine Ins. Co.*, 168 N.E.3d 1, 11 (Ohio Ct. App. 2021) (citing *Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246, 248 (1996)). "If the two states would use the same rule of law or would otherwise reach the same result, it is unnecessary to make a choice of law determination because there is no conflict of law." *Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004) (citation omitted). Where there is no conflict, local law governs. *Id.* As defendants concede, and as borne out by the Court's own research, Ohio and New York would apply similar law to the dispute herein and lead to the same result. (*See* Doc. No. 68, at 17 n.12.) Second, neither side advocated for application of New York law here; both sides confined their analysis of the various issues to Ohio law. Accordingly, to the extent that New York law would have yielded a different result (and the Court does not believe it would have), the Court finds that the parties have waived the application of New York law. *See, e.g.*, *Atlas Indus. Contractors, LLC v. In2Gro Techs.*, No. 2:19-cv-2705, 2021 WL 1139887, at *4–5 (S.D. Ohio Mar. 25, 2021) (finding that parties waived application of forum selection clause in contract where they failed to address it or explain the difference between the chosen law and the law of the forum).

other meaning is clearly intended from the face or overall contents of the instrument"). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M)*, 953 N.E.2d at 292.

Courts may use extrinsic evidence to determine the parties' intent only if the contract is ambiguous. *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) (citation omitted). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008). "[These] principles of contract interpretation establish that ordinarily judges interpret the language of contracts as a matter of law." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008).

### 2.  The MOU is Silent as to Duration

Keying in on Wiles' representations in his June 9, 2022 email to Hershberger—wherein he stated that the MOU expired on August 12, 2020—Emerald argues that the MOU was no longer in effect by the time the parties pursued Client B, and that the MOU served only as a "rough framework" for their ongoing business relationship. (Doc. No. 69, at 29 (citing and reproducing portion of  Doc. No. 60-8, at 2).) But such an interpretation is inconsistent with the plain language of the MOU. The MOU anticipates that the parties "will continue in good faith to negotiate the terms of the final LTA and terms and conditions of supply[.]" (Doc. No. 54-1, at 1.) During these negotiations, the MOU expects the parties to "use their respective commercially reasonable efforts to enter into [the final LTA] by August 12, 2020." (*Id.*) The MOU does not state, however, that the agreement terminates on that date (August 12, 2020) if the parties' efforts have not produced an enforceable LTA. Instead, it explicitly allows for the possibility that those commercially

16

reasonable efforts may not yield a final LTA during this 60-day period. Specifically, paragraph one of the MOU states that "[i]f the LTA is not agreed and finalized as provided for herein, the Parties will continue to operate under the terms of this MOU, until the LTA is completed." (*Id*. ¶ 1.) While it is clear that the parties were to make every good faith effort to arrive at an LTA by August 12, 2020, to find that the MOU expired on that date would require the Court to disregard the equally clear language of paragraph one of the MOU. *See Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth*., 678 N.E.2d 519, 526 (Ohio 1997) (holding that a court interpreting a contract "should give effect, if possible, to every provision therein contained" (quoting *Farmers Nat'l Bank v. Deleware Ins. Co*., 94 N.E. 834, syllabus ¶ 6 (Ohio 1911))). The Court, therefore, finds that the MOU did not expire on August 12, 2020; rather, the Court concludes that the MOU is silent as to the term of duration.[10]

---

[10] Such a conclusion is bolstered by the fact that the parties knew how to write a termination date into a contract. The NDA provided, in clear and unambiguous language, that it would "terminate automatically after one hundred eighty (180) days from [the effective] date unless extended in writing by the Parties." (Doc. No. 54-2 ¶ 5 (Term Provision).) Given the precise durational language in the NDA, the parties' failure to include a durational term in the MOU is telling.

### 3. A Reasonable Period of Time Applies to the Duration of the MOU

Under Ohio law, "[w]hen contracting parties fail to express the duration of their contractual obligations, the duration of the agreement may be implied from the nature of the contract and surrounding circumstances." *Rentz v. Dynasty Apparel Indus., Inc*., No. C-3-96-205, 1999 WL 35801176, at \*11 (S.D. Ohio Feb. 5, 1999) (collecting Ohio cases). "Even when the duration of a contract cannot be inferred from the nature of the agreement or the surrounding circumstances, the contract remains enforceable. The law simply implies that the parties intended and agreed upon a reasonable duration." *Id*. (citing Ohio cases); *see M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015) (noting that contracts that 'are silent as to their duration will ordinarily be treated not as 'operative in perpetuity' but as 'operative for a reasonable time'" (quoting 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960)); *see generally Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 273 (Ohio 1984) (holding that "if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term" (citation omitted)). Accordingly, the Court may infer that the parties anticipated that the MOU would be in effect for a reasonable duration.

Determining *what* constitutes a "reasonable duration," however, is another matter. In the present case, the parties have failed to identify any evidence in the record relating to the conditions and circumstances surrounding the formation of the agreement that would shed light on how long it was anticipated that the MOU would govern the parties' dealings. While the business opportunity afforded by Client A was the focal point of the MOU, the agreement clearly contemplated the pursuit of other prospective customers. The parties have not pointed to any record evidence that would permit the Court to determine, as a matter of law, what the parties contemplated would be

18

a reasonable time for such pursuits (or other pursuits that would be identified during the time period they sought these identified opportunities).[11] Indeed, the parties' June 9, 2022 email exchange relative to their understanding of the duration of the MOU—and the fact that the parties have now dramatically retreated from the positions their respective executive officers took on June 9, 2022—only serves to underscore that the Court cannot make this determination as a matter of law. *See Inland Refuse Transfer*, 474 N.E.2d at 322–24 (summary judgment was improperly granted where the parties failed to expressly state the duration of a landfill agreement and it could not otherwise be determined, as a matter of law, from the language in the agreement).

### 4. *Uncertainty as to a Threshold Issue Precludes Summary Judgment*

The uncertainty as to this threshold issue prevents the Court from granting defendants summary judgment on the majority of Emerald's claims. If the MOU was still in effect when the parties pursued Client B and encompassed Client B, the MOU, by its terms, would bar many of Emerald's claims. For example, Count One (Fraud)[12] and Count Four (Promissory Estoppel) rely on allegations that defendants orally promised Emerald that, in exchange for confidential

---

[11] As indicated, and although not squarely addressed in the briefing, there is also a question of fact as to whether the MOU would cover the negotiations over Client B. The MOU indicated that the parties intended to market services to "identified Customers." (Doc. No. 54-1 ¶ 1.) Notwithstanding the fact the word "customer" was capitalized, the MOU did not define the term. Further, while there is no dispute that Client B is not included in the list of "Prospective MOU customers" identified in Exhibit A, the MOU does not state that its reach is limited to those entities listed in Exhibit A or those known or disclosed by the parties at the time the agreement was executed. Conversely, while defendants advocate for the enforcement of the MOU as to the negotiations involving Client B, Wiles testified in his deposition that he did not think the MOU contemplated negotiations in 2021 regarding other prospective customers that were not identified in Exhibit A. (*See* Doc. No. 54, at 30 (114–17).) Yet, a fact-finder could find that the parties reached an agreement as to certain terms regarding worked to be performed for Client B.

[12] Though labeled "Fraud/Fraudulent Misrepresentation/Fraudulent Inducement/Fraudulent Concealment[,]" Count One is best understood as a claim for promissory fraud. *See Backus v. Bank of Am., N.A.*, 896 F. Supp. 2d 686, 689 (S.D. Ohio 2012) ("A fraud claim will exist . . . where the person or entity making the promise of future action never had any intention of keeping the promise." (citing *Tibbs v. Nat'l Homes Constr. Corp.*, 369 N.E.2d 1218, 1223 (Ohio Ct. App. 1977)). Distilled to their essence, the allegations in Count One accuse defendants of promising Emerald that it would receive a 10% commission and handle all inspection duties for Client B within a certain geographic area with no intention to follow through on either promise. (*See* Doc. No. 1-1 ¶¶ 66–73.)

information regarding the business opportunity with Client B and the ability to proceed as the lead

on any contract with Client B, defendants would assign a portion of the inspections to Emerald

and pay Emerald a 10% commission. (Doc. No. 1-1 ¶¶ 6–7, 66–73, 91–96.)[13] However, such oral

arrangements are strictly prohibited by the modification clause in the NDA, which was

incorporated by reference into the MOU. (*See* Doc. No. 54-2 ¶ 12.) Additionally, if the MOU was

still in effect and covered Client B, the integration clause made clear that the written agreement

constituted the "sole and entire understanding" of the parties' agreement regarding the exchange

of information relating to business opportunities, and the "Modification" provision required all

modifications to be in a writing, signed by both parties, Emerald would be precluded from relying

on  promises to the contrary. (*Id*. ¶¶ 12–13.)[14]

Additionally, the existence of a binding contract that covers Client B would bar Emerald

from alternatively seeking damages in tort for conduct covered by the contract. "[U]nder Ohio law

the existence of a contract action generally excludes the opportunity to present the same case as a

tort claim." *Wolfe v. Cont'l Cas. Co*., 647 F.2d 705, 710 (6th Cir. 1981). "[A] tort exists only if a

party breaches a duty which he owes to another independently of the contract, that is, a duty which

would exist even if no contract existed." *Id*.; *see also Netherlands Ins. Co. v. BSHM Architects,

Inc*., 111 N.E.3d 1229, 1236 (Ohio Ct. App. 2018) ("Where the causes of action in tort and contract

---

[13] In the complaint, Emerald's reference to Client A relates to the entity that the parties identified in the key and consistently referred to in the briefing as Client B. (*See* Doc. No. 67.) To avoid confusion, the Court uses the key the parties agreed upon for purposes of discussing the customers and prospective customers, including the prospective customer that is at the center of this litigation.

[14] The MOU, as augmented by the NDA, would also bar Count Seven (Breach of Fiduciary Duty). Paragraph 10 of the NDA, "Relationship of Parties," clearly states that "Neither Party: . . . (b) shall owe a fiduciary duty to the other Party[.]" (Doc. No. 54-2 ¶ 10.) Further, most of the compensatory damages Emerald seeks to recover would be barred by the MOU, which contained a "Limitation of Liability" provision that prohibited any recovery for "loss of use, loss of contracts, loss of profit, loss of revenue, loss of good will, loss of anticipated savings, increased costs, liabilities to third parties or any indirect, special or consequential losses, howsoever arising." (Doc. No. 54-1 ¶ 2(b).)

are 'factually intertwined,' a plaintiff must show that the tort claims derive from the breach of duties that are independent of the contract and that would exist notwithstanding the contract." (citations omitted)).

It appears that the parties entered into the NDA and the MOU because they wished to jointly pursue certain business opportunities by sharing confidential information about prospective customers and using that information to their collective benefit. The MOU was intended to provide the "framework" for their endeavors, and, together, the MOU and the NDA defined the parties' rights and duties. One of those duties was the duty not to contract with the other signatory's customers during the term of the contract and for a period of two years thereafter. (Doc. No. 54-1 ¶ 2(d).) Beyond that, and the duty to protect confidential information, the parties were under no duty to enter into any particular transaction or provide compensation to the other party for sharing confidential information about prospective clients. If the MOU was still in play as to Client B, any duty would have flowed from the contract and could not be considered a separate, independent duty from which tort liability could result. *See Smith v. City of Barberton*, No. 1:20-cv-584, 2021 WL 752595, at *5 (N.D. Ohio Feb. 26, 2021) (noting that "[t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement" (quotation marks and citations omitted)); *see also Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 767 (N.D. Ohio 2013) (finding that plaintiff's argument that defendant owed a separate duty to defendant "ignores the fact that [defendant] would owe [plaintiff] no duties whatsoever but for the contract"). The Court, therefore, cannot resolve the majority of Emerald's claims on summary judgment.

### B.  Breach of Implied Contract (Count Two)

Certain of Emerald's claims, however, can be resolved as a matter of law. Defendants argue

that the Court need not rely on the enforceability of the MOU to grant them summary judgment on Emerald's contract and quasi-contract claims because the parties never reached a "meeting of the minds" as to Emerald's right to commissions for Client B. (Doc. No. 68, at 19.) Pointing to the June 9, 2022 email exchange, defendants argue there was no meeting of the minds because both Hershberger and Wiles agreed that the parties still needed to work out the duration of the commissions and whether they would be reduced over a period of time until they were phased out entirely. (Doc. No. 68, at 20.) The Court agrees with defendants, but only with respect to Emerald's breach of implied contract claim as to commissions, and only then to the extent the claim seeks commissions beyond the initial contract period anticipated by the parties[15]

Under Ohio law, it is well settled that "parties cannot enter into an enforceable contract unless they come to a meeting of the minds on the essential terms of the contract." *Adv. Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) (citing Ohio cases); *Union Sav. Bank v. White Family Cos., Inc.*, 916 N.E.2d 816, 817–18 (Ohio Ct. App. 2009) (citation omitted). Only an objective meeting of the minds, or mutual assent, as to the essential terms is necessary. *See Kreller Grp., Inc. v. WFS Fin., Inc.*, 798 N.E.2d 1179, 1186 (Ohio Ct. App. 2003) (citation omitted). "The essential terms of a contract include the identity of the parties to be bound, the subject matter of the contract, the consideration to be exchanged, and the price to be paid." *Smith-Knabb v. Vesper*, 206 N.E.3d 1265, 1271 (Ohio Ct. App. 2023) (citation omitted); *see Nilavar v.*

---

[15] The absence of a "meeting of the minds" with respect to an essential term would not necessarily bar quasi-contract and tort claims. *See Nachar v. PNC Bank, Nat'l Ass'n*, 901 F. Supp. 2d 1012, 1020 (N.D. Ohio 2012) (noting that promissory estoppel "allows a separate remedy for damages in the absence of an enforceable contract" (citing *Olympic Holding Co. L.L.C. v. ACE Ltd.*, 909 N.E.2d 93 (Ohio 2009)); *Meyers v. Good*, No. 06CA2939, 2007 WL 2897753, at *2 (Ohio Ct. App. Sept. 27, 2007) ("When a contract fails for a lack of 'meeting of the minds,' equity should be imposed to prevent an unjust enrichment." (citation omitted)); *see also Patel v. Univ. of Toledo*, 95 N.E.3d 979, 990 (2017) ("Since a promise necessarily carries with it the implied assertion of an intention to perform[,] it follows that a promise made without such an intention is fraudulent . . . . *This is true whether or not the promise is enforceable as a contract*." (quotation marks and citations omitted (emphasis added))).

*Osborn*, 711 N.E.2d 726, 734 (Ohio Ct. App. 1998) ("In a contract that is not for goods, the essential terms are, generally, the parties to the contract and its subject matter." (citing 17 Ohio Jurisprudence 3d (1980) 446, Contracts, § 17)).

"In contracts implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding." *Union Sav. Bank*, 946 N.E.2d at 841 (quotation marks and citations omitted); *Nilavar*, 711 N.E.2d at 733 (noting that "expressions of assent are generally sufficient to show a meeting of the minds" (citation omitted)). "Whether there has been a manifestation of mutual assent and/or a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." *Adv. Sign Grp.*, 722 F.3d at 784 (quotation marks and citations omitted).

There are certainly questions of fact as to whether the parties reached a meeting of the minds as to whether Emerald would receive a 10% commission and subcontracted work for Client B over the course of the initial contract. The proposals to Client B referencing Emerald performing inspections, the worksheet showing a 10% commission rate, the referenced emails, and contemporaneous text messages between Hershberger and Wiles discussing Emerald's 10% commission would permit, though not require, a fact-finder to find that there was an agreement that Emerald was to receive a 10% commission and subcontracted inspections for Client B during the initial contract period. (*See, e.g.*, Doc. No. 60-6, at 46 (text message referring to Emerald's 10% commission).)

It is undisputed, however, that the parties never reached a tacit understanding as to how long Emerald would be entitled to receive commissions beyond the initial contract period, or whether these benefits would be tapered over time. In the June 9, 2022 email exchange, Wiles

made clear that he did not agree to a 10% commission rate in perpetuity and that he would only consider a "winding down of the commission" over the term of the first contract with Client B. (Doc. No. 60-8, at 2.) Hershberger agreed that a discussion of a "sunset" on commissions was a conversation that "can and needs to happen." (*Id*. at 1.)

Emerald argues that, in the absence of an agreement as to duration of the commissions, a reasonable time can be inferred. (Doc. No. 69, at 22–24.) As previously observed, where a contract is *silent* as to a durational term, it may be inferred that the parties intended a reasonable period of time. Even the case law relied upon by Emerald, however, underscores that the Court may infer a reasonable time applies only where the parties have otherwise completed their negotiations and simply failed to include an end date for the agreement. *See, e.g.*, *Nilavar*, 711 N.E.2d at 734–35 ("Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract." (quotation marks and citations omitted)). The aforementioned email exchange makes evident that the parties were not done negotiating over the future of Emerald's commissions for Client B after the initial contract period; they agreed they still needed to resolve key issues relative to commissions going forward.

Because there was no meeting of the minds as to commissions  beyond the initial contract period—such as duration of the commissions and whether the commissions would be phased out over time—the Court concludes there was no meeting of the minds beyond the initial contract period as to this essential term, and, therefore, no enforceable implied contract with respect to any

future commission-based benefits.[16] Accordingly, defendants are entitled to summary judgment on Emerald's breach of implied contract claim, to the extent it seeks damages relating to commissions beyond the initial anticipated contract with Client B.

Viewing the evidence in a light most favorable to Emerald, however, there remains a question of fact as to whether the parties reached an agreement as to the future of Emerald's involvement in performing inspections for Client B. Wiles indicated in his email that the parties had agreed to Emerald performing inspections within its geographic footprint without any discussion of phasing out or discontinuing such right in the future, unlike Wiles' discussion that immediately followed regarding the future of commissions beyond the initial contract period. (Doc. No. 68-2, at 2.) Hershberger, likewise, acknowledged no limitation on Emerald's right to perform a limited number of inspections for Client B beyond the initial one-year period. (*See id.* at 3.)

### C.  Breach of Express Contract (Count Three)

In Count Three, Emerald alleges that it was an intended third-party beneficiary to the

---

[16] That the parties left this essential term for possible future negotiations also shows that the term was not sufficiently certain. The terms of an agreement "are sufficiently certain if they 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Nilavar*, 771 N.E.2d at 734 (quoting *Mr. Mark Corp. v. Rush, Inc*., 464 N.E.2d 586, 589–90 (Ohio Ct. App. 1983) (further citation omitted)). Because the Court or a trier of fact would be unable to determine what the parties' agreement was with respect to future commissions, it would be forced to draft a contract for the parties in order to fashion an appropriate remedy. The Ohio Supreme Court has long since prohibited such a practice. *See Litsinger Sign Co. v. The Am. Sign Co*., 227 N.E.2d 609, 619 (Ohio 1967) ("It is settled law that if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the Court to determine what the agreement is and to enforce it without, in effect, 'making a contract for the parties,' no enforceable obligation results." (citations omitted)); *see also Savedoff*, 524 F.3d at 769 ("Indeed, Ohio law prohibits a court from creating a contract for the parties when their contract has failed to address a particular matter." (collecting cases).

MSA[17] between 7G and Client B, and is therefore entitled to collect damages from 7G for "failing to receive its Commission Fee due" for Client B under the MSA, and for "being precluded from performing all of the Inspection Services for [Client B] in Ohio, Michigan, and Indiana, as negotiated and agreed to between the parties." (Doc. No. 1-1 ¶¶ 82–89.) Defendants respond to these allegations by arguing that "the terms of the MSA do not confer upon Emerald status as a third-party beneficiary[,]" and, in any event, the MSA is no longer in effect and Emerald has pointed to no evidence that it is an intended third-party beneficiary of the subsequent oral agreement between 7G and Client B. (Doc. No. 71, at 12–13.)

"The Ohio Supreme Court has held that only intended third-party beneficiaries may assert rights to contracts to which they are not party." *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 855 (6th Cir. 2020) (citing *TRINOVA v. Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 577 (Ohio 1994) (further citations omitted)). "For a third-party beneficiary to be an intended beneficiary, the contract must have been entered into directly or primarily for the benefit of that individual." *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 818 (N.D. Ohio 2006) (citing *Reisenfeld & Co. v. Network Grp., Inc.*, 277 F.3d 856, 863 (6th Cir. 2002) (further citation omitted)); *Sony Elec., Inc. v. Grass Valley Grp., Inc.*, Nos. C-010133, C-010423, 2002 WL 440749, at *3 (Ohio Ct. App. Mar. 22, 2002)). "Generally, the parties' intention to benefit a third party will be found in the language of the agreement." *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011).

---

[17] The MSA contains a forum selection clause stating that the "validity, interpretation and performance [of the agreement] shall be governed by the laws of the State of Iowa." (Doc. No. 69-6 ¶ 17.) Nonetheless, the parties have relied exclusively on Ohio law to support their arguments regarding the interpretation and enforcement of the MSA. (*See* Doc. No. 68, at 20–21; Doc. No. 69, at 27–29; Doc. No. 71, at 12–13.) As was the case with the NDA and the MOU, the parties have waived the right to argue that the law of the selected forum governs the MSA. *See, e.g.*, *Atlas Indus. Contractors*, 2021 WL 1139887, at *4–5.

Courts apply the "intent to benefit" test to determine whether a beneficiary is an intended beneficiary. *Hill v. Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784–85 (Ohio 1988) (quotation marks and citation omitted). As the Ohio Supreme Court explained,

> Under this analysis, if the promisee . . . intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract.

*Id.* (quotation marks and citation omitted, alterations added by *Hill*). The conferring of some benefit upon a non-signatory by the performance of a promise is not enough; "the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Hill*, 521 N.E.2d at 784 (noting that "[p]erformance of a contract will often benefit a third person. But unless the third person is an intended beneficiary . . . no duty to him is created" (quotation marks and citation omitted)).

In considering whether Emerald is an intended third-party beneficiary, the Court finds an Ohio case particularly instructive. In *Sony Electric*, an audio-visual equipment manufacturer alleged that it was an intended third-party beneficiary to a contract between a public authority and a contractor for the construction of a professional football stadium production facility. 2002 WL 440749, at *1. While the agreement anticipated that the manufacturer (as the product supplier designated in the bid package) would supply some of the products that would be used in the production facility, the court found that the complaint allegations, if believed, did not support a finding that the contract was entered into to benefit the manufacturer. *Id.* at *4. In dismissing the complaint, the court found that the purpose of the contract was to construct the production facility. *Id.* "At most, [the court found] the contract was entered into to benefit the county and the public at large, not a supplier of some of the products that would be used in the construction." *Id.* (citation

27

omitted).

Confining itself to the language of the MSA, as it must in the absence of any ambiguity in the agreement, the Court finds that the clear purpose of the agreement was to provide a "framework within which [Client B] and [7G] may execute a Statement or Work/Service Orders to provide services" for Client B. (Doc. No. 69-6 ¶ 1.) Even though Emerald is identified as a subcontractor, there is nothing in the MSA that would support a finding that the parties entered into the MSA to benefit Emerald. The contract was entered into to provide Client B with environmental compliance services. Emerald enjoyed, at best, an ancillary benefit to perform some work as a subcontractor. "It is, of course, obvious that the contract as a whole was not entered into 'directly or primarily for the benefit' [of Emerald]." *See Reisenfeld*, 277 F.3d at 864 (real estate broker was not an intended beneficiary of a contract to sell or sublease closed department stores).

As further evidence of Emerald's status as an incidental beneficiary, the MSA provides that neither party to the agreement "may assign, or transfer any rights under or interest (including, but without limitation, monies that are due or may become due) under the Agreement without the written consent of the other, except to the extent that any assignment, subletting, or transfer is mandated by law." (Doc. No. 69-6 ¶ 16.) While the "Assignment" clause contemplates that 7G "will subcontract many or all of the Services[,]" it specifically states that "[n]o such subcontract will relieve [7G] for [sic] its obligations under this Agreement." (*Id*.) The MSA makes clear that it did not intend to confer any rights or benefits upon third-parties or relieve 7G of its obligations by virtue of any subcontract. *See DVCC, Inc. v. Med. Coll. of Ohio*, No. 05AP-237, 2006 WL 496036, at *10 (Ohio Ct. App. Mar. 2, 2006) (similar limiting provision in contract conferred only incidental beneficiary status on identified subcontractor); *Joest Vibratech, Inc. v. N. Star Steel Co*., 109 F. Supp. 2d 746, 750 (N.D. Ohio 2000) (existence of a no-assignment clause demonstrates

that non-signatory was not an intended third-party beneficiary with enforceable rights under the agreement, notwithstanding reference to non-signatory in addendum as a subcontractor).

Because the Court finds, as a matter of law, that Emerald was only an incidental beneficiary to the MSA, Emerald has no enforceable rights under the MSA, and defendants are entitled to summary judgment on the breach of express contract claim.[18]

### D.  Tortious Interference with Business Relationships (Count Six)

In Count Six, Emerald alleges that defendants tortiously interfered with Emerald's business relationships with Client A and Client B. To prevail on such a claim, Emerald must demonstrate: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Kelley v. Buckley*, 950 N.E.2d 997, 1013 (Ohio Ct. App. 2011) (quotation marks and citation omitted)). "[E]ven if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).

In his affidavit, Hershberger avers that after Emerald's dispute with defendants over Client B, "Wiles ordered the restriction of Emerald's access to the Protean software." (Doc. No. 69-2 ¶ 16.) According to Emerald, after its access to Protean was severed, "Emerald was unable to properly service Client A, causing Client A to transition the service of several sites to Defendants, thereby preventing Emerald from collecting its mark-up on Client A billings for services

---

[18] Because Emerald is not an intended third-party beneficiary to the MSA, it is without authority to enforce the MSA's "no oral modification" provision, or otherwise complain that 7G cannot now contend that the MSA was superseded by an oral month-to-month agreement. *See Cook*, 961 F.3d at 855 ("[O]nly intended third-party beneficiaries may assert rights to contracts to which they are not party."). In any event, there are no genuine issues of material fact as to whether Emerald is an intended third-party beneficiary to either agreement.

subcontracted out to 7G." (*Id.* ¶ 17.) Hershberger admitted in his deposition, however, that Wiles made the decision, on behalf of Protean, LLC, to restrict Emerald's access to Protean because Emerald refused to pay 7G for the inspection services for Client A it subcontracted from Emerald. (Doc. No. 60, at 25 (116–17); *see also* Doc. No. 54, at 89 (353).) Hershberger further conceded that Emerald refused to pay 7G because 7G refused to pay Emerald the 10% commissions Emerald believed it was owed for Client B. (Doc. No. 60, at 42 (184).)[19] Regardless of whether Emerald can recover on its tort claims relating to Client B, the undisputed evidence demonstrates that any loss in business from Client A was ultimately the result of Emerald's actions, not 7G's.[20] 7G is therefore entitled to summary judgment on the portion of Emerald's tortious interference claim relating to Client A.

Questions of fact, however, preclude summary judgment on the portion of Count Six relating to Client B. As was the case with the majority of the quasi-contract and tort claims above, if the MOU were in effect and covered Client B, any claim of tortious interference relating to Client B would be barred because any duty owed by defendants with respect to Client B would not be independent of the duty owed under the MOU. And if the agreement is no longer effective, questions of fact would still preclude summary judgment. While defendants argue throughout the briefing that they were concerned about partnering with Emerald due to Emerald's failure to execute on certain trial inspections (a fact that is only partially borne out by the record cites

---

[19] Hershberger even admitted that he knew Emerald's withholding of payment to 7G could be detrimental to 7G. (Doc. No. 60, at 42 (184) (Q. "And you knew that withholding payment could be detrimental to 7G's business?" A. "There was that, and there was also . . . .").)

[20] To the extent Hershberger's affidavit can be construed as contradicting his deposition testimony regarding the triggering events and the timing thereof, it is well settled that a party cannot generate a genuine issue of material fact "by filing an affidavit that contradicts the party's earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006) (citations omitted).

identified by defendants), the proposals to Client B, contemporaneous text messages, and even the MSA ultimately entered into between Client B and 7G all show that defendants continued to plan on Emerald performing inspections. A trier of fact could conclude, therefore, that defendants' concern about Emerald's competence and ability to perform inspections was contrived to support defendants' decision to appropriate Client B.

## IV. CONCLUSION

For the foregoing reasons, defendants' summary judgment motion is granted, in part, and denied, in part. Defendants are granted judgment in their favor as follows: (1) plaintiff's claims of breach of implied contract (Count Two), to the extent plaintiff seeks as damages commissions beyond the initial contract period with Client B; (2) breach of express contract (Count Three); and (3) the portion of plaintiff's tortious interference claim (Count Six) relating to allegations that defendants tortiously interfered with Client A. These claims (or parts of claims) are dismissed with prejudice. Summary judgment on the remaining claims is denied.

Dated: October 14, 2024

_____
**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**